# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>ANTHONY SIROTKA,<br><br>              Defendant. | Docket No.: 1:21-CR-00454-CM |

## DECLARATION OF VINITA JUNEJA, PH.D.

I, **Vinita Juneja, Ph.D.**, hereby declare under penalty pursuant to 28 U.S.C. §1746 that the following is true and correct:

### I.     Qualifications

1.      I am a Senior Managing Director at NERA Economic Consulting ("**NERA**"). I have been the Chair of NERA's Global White Collar, Investigations & Enforcement Practice and the Chair of NERA's Global Securities and Finance Practice. NERA, a firm established over 60 years ago, employs over 500 people in over 20 offices worldwide. NERA employs a research staff of professionals with degrees in economics, finance, accounting and mathematics. Our clients include regulators, risk managers, principals requiring valuation services, and parties involved in disputes resulting in litigation, mediation and arbitration.

2.      I have a B.A. (Honors) in economics from the University of Western Ontario, now known as Western University. I also have an M.A. and a Ph.D. in economics from Harvard University. I have taught courses in economics and business regulation and have lectured at the graduate and undergraduate level at Western University. My publications include chapters in books on the topics of financial litigation, arbitration, and event studies. I have authored papers on

1

the extent and nature of shareholder claims. I also have served as an arbitrator for the Financial Industry Regulatory Authority (FINRA) and its predecessor, the National Association of Securities Dealers ("**NASD**"). I have testified at trials and at depositions and have submitted expert affidavits in both state and federal courts in the United States. I have also appeared as an expert witness in Canadian courts and in arbitrations before the New York Stock Exchange, NASD, the American Arbitration Association, the ICC International Court of Arbitration, the London Court of International Arbitration, and the Judicial Arbitration and Mediation Services, among others. I have also presented my findings to regulators, such as the SEC, in the course of enforcement related investigations.

3. My testimony, affidavits, reports, analyses, and depositions have covered numerous economic and statistical issues arising in many securities, financial economics and valuation-related lawsuits, and in regulatory investigations and disputes. Subjects covered in my testimony, affidavits and depositions include: the evaluation of market efficiency; the materiality of news to reasonable investors; the impact of news on company share prices; the relationship between stock prices and earnings surprises; causation and damage analyses in securities class actions and matters involving securities fraud; and other issues related to financial valuation and securities litigation. I have spoken frequently on the topics of damages, valuation, event studies, shareholder litigation and derivative actions to audiences including risk managers, regulators, executives from publicly traded corporations, insurance industry participants and lawyers.

4. My curriculum vitae listing publications from the past ten years and testifying experience from the past four years is attached as **Exhibit 1**.

## II. Materials Relied Upon

5. The list of materials I relied upon in the preparation of this declaration is attached as **Exhibit 2**.

### III.    Assignment

6.      My understanding is that on June 5, 2023, Mr. Sirotka pled guilty to charges stemming from his involvement in a multifaceted scheme by various officers and employees of FTE Networks, Inc. ("**FTE**" or the "**Company**") to fraudulently represent to investors, lenders, accountants, and others that FTE's financial condition was better than it actually was.[1] The overarching scheme primarily involved (i) the concealment and improper accounting of convertible notes issued by FTE (the "**Convertible Notes Fraud**"), and (ii) the improper recognition of millions of dollars in fictitious revenue in FTE's financial statements between 2016 and 2018 (the "**Revenue Recognition Fraud**").[2] I understand that Mr. Sirotka's role in the scheme was limited to the improper recognition of approximately $12.5 million in fraudulent revenue in FTE's financial statements.[3] I understand from the Indictment that of this $12.5 million in fraudulent revenue, $10,077,000 (approximately $10.1 million) was allegedly reported as revenue in FTE's quarterly filings for the first three quarters of 2018.[4] It is my understanding that Mr. Sirotka's co-defendants, Mr. Palleschi and Mr. Lethem, were involved in all aspects of both the Convertible Notes Fraud and the Revenue Recognition Fraud and also engaged in other criminal conduct.[5]

7.      Mr. Sirotka's counsel has asked me to review information in this case to assist the Court in determining a reasonable estimate of the loss to FTE's shareholders attributable solely to Mr. Sirotka's conduct. Specifically, I was asked to evaluate the government's estimate of loss to

---

[1] *United States v. Anthony Sirotka*, 1:21-cr-00454 (S.D.N.Y.), Jun. 5, 2023, Minute Entry. Government's Sentencing Memorandum, *United States v. David Lethem*, No. 21 Cr. 454 (CM) (S.D.N.Y May 6, 2025) (Dkt. No. 100) ("**Lethem Sentencing Memorandum**").

[2] Lethem Sentencing Memorandum, pp. 5-36.

[3] Superseding Indictment, *United States v. Michael Palleschi, David Lethem, and Anthony Sirotka*, No. S1 21 Cr. 454 (CM) (S.D.N.Y.), filed June 2, 2022, ¶¶ 31-35 (the "**Indictment**").

[4] Indictment, ¶¶ 27-35. Lethem Sentencing Memorandum, pp. 30-31.

[5] Lethem Sentencing Memorandum, pp. 4-5.

FTE shareholders caused by the inclusion of $12.5 million in fraudulent revenue in FTE's financial statements, and to provide a corrected estimate, if necessary, based on the assumption that the government's methodology is an appropriate method to reasonably determine such loss.

8.      NERA's compensation is not contingent in any way upon the nature or substance of my findings in this declaration or on the outcome of this matter.

## IV.    Summary of Findings

9.      Based on my review and analysis, I have reached the following conclusions:

The government's loss calculations require several assumptions. I find at least three of these assumptions are erroneous, which I describe below.[6] Notwithstanding the errors in the government's methodology, I calculate the loss using the government's flawed method but correct for certain other errors in the calculation. I present three alternative calculations of the loss with these corrections:

(a.) Correcting the calculation to remove the shares held by co-conspirators reduces the loss figure attributable to Mr. Sirotka's conduct from $1,965,615[7] to $1,488,598.

(b.) Correcting the event study date used to estimate the impact of a new contracts announcement reduces the loss figure attributable to Mr. Sirotka's conduct from $1,965,615 to $1,284,358, and also then removing the shares held by co-conspirators further reduces the loss figure to $972,338.

(c.) Correcting the calculation to remove the shares held by co-conspirators, correcting the event study date, and using a fictitious revenue amount of $10.1 million reduces the loss figure attributable to Mr. Sirotka's conduct from $1,965,615 to $650,034.

## V.    The Government's Event Study Calculation is Wrong

10.     The government's analysis suffers from several methodological flaws. At the outset, the government provides no support for an event study analysis derived from the price

---

[6] Adjustments made to the government's analysis do not constitute my acceptance of the methodology as a reasonable method to calculate loss attributable to Mr. Sirotka's conduct for a number of reasons as discussed below.

[7] Counsel has advised me that the Presentence Investigation Report states that the loss amount attributable to Mr. Sirotka is $1,965,615. Counsel has further advised me that this number was based on the calculation set forth in the Lethem Sentencing Memorandum.

impact of a news event not directly related to the fictitious revenue. The government's analysis is premised on the assumption that disclosing positive news (the acquisition of new contracts that would potentially generate future revenues) would have the same impact on the Company's stock price as the disclosure of negative news (a revenue shortfall by the Company). There is no support provided for the assumption that a positive announcement that affects future cash flows for this Company in a very specific manner can be used to infer the stock price reaction to a negative announcement of a revenue guidance miss. Nor is there any consistent and predictable statistical relationship demonstrated between the amount of contract revenue FTE announced in 2018 and 2019 and the magnitude of the corresponding abnormal share price reaction or the change in market capitalization.[8]

### a) The Government's Reliance Solely upon the Stock Price Reaction to the February 26, 2019 New Contracts Announcement is Not Appropriate

11.     The government's calculation relies on the price impact from a February 26, 2019 announcement by the Company of $116 million in new contracts.[9] On this date the stock price increased 113% from the previous day's close, and the government's event study analysis calculated the abnormal share price reaction from the announcement to be $1.24 per share (or 114% higher than the prior day's close). However, the government's event study fails to take into account that the stock price reaction on this date was likely affected by factors other than the amount of potential future revenues announced.

---

[8] I performed a linear regression analysis of the relationship between the abnormal share price reaction and the value of new contracts announced for FTE's eleven new contract announcements throughout 2018 and 2019, with the last one being the February 26, 2019 announcement used in the government's event study, and found that contract value was not a statistically meaningful predictor of the abnormal change in FTE's stock price on days with an announcement of new contract awards (at the standard 5% significance level). I also performed this analysis on the relationship between FTE's abnormal market capitalization change and the value of the new contracts announced for these same eleven announcements and found no consistent relationship between the new contracts announced and the abnormal change in market capitalization.

[9] Given trading halts and other contemporaneous events, a different date is needed to act as a proxy as there is no clear unique disclosure event concerning the Revenue Recognition Fraud.

12. As a general matter, prior to February 26, 2019, FTE's share price already reflected several non-revenue recognition issues occurring and/or disclosed throughout 2018 and into 2019, including information about what became the Convertible Notes Fraud. According to the Lethem Sentencing Memorandum, "[b]y the fall of 2018, FTE's share price was dropping amid heavy trading volume, leading some shareholders, analysts and FTE employees to suspect that FTE had, in fact, issued convertible debt."[10] During FTE's third quarter 2018 earnings call, an analyst asked "Can you please address the share issuance for the past six to nine months? It seems like there's been a lot more supply coming into the market."[11] Corrective disclosures possibly presaging the Convertible Notes Fraud occurred starting in January 2019 and were occurring either prior to or contemporaneously with corrective disclosures relating to the revenue recognition issues. Simply examining a stock price reaction to a new contract announcement cannot provide a proxy for the revenue recognition correction, given other proximate events.

13. In addition, FTE made ten similar new contract announcements in 2018 and 2019 prior to the February 26, 2019 announcement. See **Exhibit 3.** The February 26, 2019 announcement is the only new contract award announcement made *after* FTE had started disclosing information indicating potential issues at the Company, none of which concerned the fictitious revenue. For example, on January 24, 2019, after market close, FTE announced that its Chief Operations Officer had resigned and that it had granted its CEO a temporary leave of absence.[12] One FTE analyst viewed this news as negative information: on January 25, 2019, Roth Capital Partners stated that "investors now need to understand implications of recent management changes" and placed FTE under review "reflecting recent management changes and a need to

---

[10] Lethem Sentencing Memorandum, p. 17.
[11] FTE Q3 2018 Earnings Call, November 20, 2018, obtained from FactSet Research Systems, Inc.
[12] FTE Form 8-K, filed January 24, 2019, p. 2.

assess the implications/impact." The analyst also suspended its estimates and price target and noted that "prior estimates, rating and price target should no longer be relied upon" as of that date.[13] As such, the news of new contract awards on February 26, 2019 may have been viewed more positively by the market than had it happened at an earlier time because it was a positive news event coming after the negative news regarding senior management changes and the suspension of coverage by an analyst that covered the Company.

14.     Assuming the use of a new contract announcement is an appropriate method for measuring price impact, it is more appropriate to select an announcement that occurred before the management changes announced on January 24, 2019 but still "approximately the same time" as the hypothetical 2018 revenue miss in the government's analysis.[14] For example, on January 3, 2019, FTE announced the acquisition of $129.6 million in new contracts.[15] The stock price increased by 14.3%, or an abnormal share price reaction, i.e. adjusted for market and industry factors, of $0.51 (or 18.2% of the prior day's close).[16]

### b) The Government's Calculation Improperly Overstates the Impact of the Fictitious Revenue Which Artificially Increases the Loss Amount

15.     First, as stated above in paragraph 6, I understand from the Indictment that only $10.1 million of the $12.5 million in fraudulent revenue was allegedly included as revenue in FTE's quarterly filings for the first three quarters of 2018. As such, the government's loss

---

[13] "FTNW: Placing Under Review," Roth Capital Partners, January 25, 2019, p. 1.

[14] Lethem Sentencing Memorandum, p. 40.

[15] "[FTE] today announced that it has been awarded approximately $129.6 million in new infrastructure projects during the fourth quarter of 2018" ("FTE Networks Completes 2018 with Approximately $572.4 Million in New Infrastructure Contract Awards," *GlobeNewswire*, January 3, 2019). FTE's 3Q 2018 press release announced that "by the end of 2018, we expect to have won over $500 million dollars [sic] in new contract work" ("FTE Networks Reports Third Quarter 2018 Results," *GlobeNewswire*, November 20, 2018). Therefore, approximately $72.4 million of new contract awards announced in January is in excess of FTE's prior guidance.

[16] Abnormal share price reaction is based on a market model regressing the daily natural log returns of FTE over the estimation period January 2, 2018 to December 31, 2018 on the daily natural log returns of the NYSE Composite Index and the NYSE U.S. Market Utilities and Telecommunications Sector Index.

calculation should first be revised to use $10.1 million of fictitious revenue rather than the $12.5 million the government used in its loss calculation.

16.     Furthermore, the government's calculation assumes that FTE would have missed its revenue guidance for 2018 if it did not include the fictitious revenues in its revenue. FTE publicly disclosed revenue guidance of $350 million for fiscal year 2018.[17] The government's calculation removes $12.5 million from revenue reported in the first three quarters of 2018 and extrapolates from what is left over to the fourth quarter. This creates a hypothetical revenue shortfall of $15.1 million for 2018 relative to FTE's guidance.[18, 19]

17.     This hypothetical shortfall overstates the would-be impact to 2018 revenue, and as a result, inflates the amount of loss the government attributes to Mr. Sirotka. The government's analysis assumes FTE would not have fared any better in the fourth quarter of 2018 than it did on average over the first three quarters of 2018.[20] However, this is a baseless assumption. The government does not need to assume what the market would have expected for 2018 or what the 2018 reported revenue would have been to calculate a hypothetical revenue miss for purposes of

---

[17] FTE first provided the $350 million revenue guidance for the full year 2018 on April 18, 2018 (FTE Form 8-K, filed April 18, 2018). FTE reiterated this guidance multiple times throughout 2018, as late as November 20, 2018 (FTE Form 8-K, filed November 20, 2018) and December 19, 2018 (FTE Form 8-K, filed December 19, 2018).

[18] The $15.1 million revenue shortfall in the government's analysis is calculated as FTE's $350 million revenue guidance less an estimated full year 2018 revenue of $334.9 million after removing the $12.5 million of fictitious revenue.

[19] The government's loss analysis assumes that there would have been a miss to 2018 revenue guidance had the fraudulent revenue not been discovered. However, FTE's restated financial statements disclosed revenue of $384.8 million in fiscal year 2018, well in excess of the $350 million revenue guidance the Company had publicly provided prior to any disclosure of the Convertible Notes Fraud or the Revenue Recognition Fraud (FTE FY 2018 Form 10-K, filed May 11, 2020, p. F-4). Additionally, FTE's restated financial statements for 2018 indicate that "contract revenues earned" in 2018 alone surpassed the revenue guidance of $350 million (FTE FY 2018 Form 10-K, filed May 11, 2020, p. F-39). The government's analysis is predicated upon a revenue miss in 2018 that did not happen even after the company restated its financial statements.

[20] There is no evidence that fourth quarter revenue would have been consistent with the revenue in the first three quarters. Revenues in the fourth quarter were reported in the 2018 10-K as $121.9 million, well above the $83.7 million used in the government's analysis (calculated as $334.9 million in estimated FY 2018 revenue less $263.7 million revenue reported in the first three quarters of 2018 less $12.5 million in fictitious revenue). (See FTE FY 2018 Form 10-K, filed May 11, 2020, p. F-40).

calculating loss. It is more appropriate to limit the impact of fictitious revenue to the actual amount of the fraudulent revenue rather than calculating a hypothetical number.

18.    I am not aware of any evidence that the Revenue Recognition Fraud attributable to Mr. Sirotka is greater than $12.5 million, nor that the impact of correcting for this fraud would be any greater than $12.5 million in revenue. Therefore, any potential reduction of 2018 revenue on account of the Revenue Recognition Fraud using the government's methodology cannot be larger than $12.5 million for the purpose of determining the loss.[21]

19.    Moreover, as set forth above, the government's methodology should be adjusted so that the amount of fictitious revenue removed in the calculation of the 2018 hypothetical revenue miss is *no more* than the $10.1 million (or at most $12.5 million) that is attributed to Mr. Sirotka's conduct, rather than the $15.1 million that the government's analysis applies.

### c) The Government Improperly Includes Shares Held by Co-Conspirators in their Loss Calculation

20.    I understand from counsel that Mr. Palleschi, Mr. Lethem, Mr. Moser and Director-1, are co-conspirators in this matter and TLP Investments LLC was an entity owned by Mr. Palleschi that held shares of FTE. According to FTE's SEC filings, co-conspirators Mr. Palleschi, Mr. Lethem, Director-1, and TLP Investments LLC collectively held 2,593,694 shares of FTE common stock as of November 12, 2018.[22] Additionally, according to FTE's 2018 Form 10-K, Mr. Sirotka was issued 363,639 shares of common stock on or around October 11, 2018.[23] Since these shares were not held by victim shareholders, they improperly inflate the number of shares in FTE's market capitalization and counsel has instructed me should not be included in the

---

[21] As discussed above in paragraph 6, it is my understanding that the relevant amount of fictitious revenue that can be attributed to Mr. Sirotka in 2018 is only $10.1 million, and not $12.5 million.

[22] FTE Form DEF 14A, filed December 10, 2018, p. 26. Mr. Moser and Mr. Sirotka's holdings were not listed in this filing.

[23] FTE FY 2018 Form 10-K, filed May 11, 2020, p. 45.

government's calculation of the Company's market capitalization for purposes of determining the loss.

### VI.    Correcting the Errors in the Government's Loss Calculation Reduces the Loss Attributable to Mr. Sirotka's Conduct

21.    As discussed in paragraph 10 above, the government's initial premise for the analysis is flawed. I accept those flaws only for the purpose of correcting the government's calculation of loss attributable to Mr. Sirotka's conduct.

22.    Incorporating certain adjustments to address errors in the government's calculation leads to lower estimates of loss attributable to Mr. Sirotka's conduct. See **Exhibit 4**. I set forth three of these adjustments herein and the loss calculation that results in each scenario.

(a)    Scenario 1: Removing the shares held by co-conspirators, while otherwise maintaining the government's methodology, reduces the loss figure attributable to Mr. Sirotka's conduct to $1,488,598.

(b)    Scenario 2: Changing the date of the news event that was used to conduct the event study to January 3, 2019 reduces the loss figure attributable to Mr. Sirotka's conduct to $1,284,358. Removing the shares held by co-conspirators further reduces the loss figure to $972,338.

(c)    Scenario 3: I adjusted the government's loss calculation to use the January 3, 2019 event study date and used $10,077,000 as the amount of fictitious revenue removed. I then adjusted the calculation by removing shares held by co-conspirators. This reduces the loss attributable to Mr. Sirotka's conduct to $650,034.

I describe the calculations for each of these scenarios in the paragraphs below.

a) **Scenario 1: Adjusting the Government's Loss Calculation Only to Remove Shares Held by Co-conspirators Reduces the Loss Attributable to Mr. Sirotka's Conduct to $1,488,598**

23.     Keeping everything else as it is in the government's loss calculation and only adjusting it to remove the shares held by co-conspirators results in a market capitalization loss of $1,488,598 attributable to Mr. Sirotka's conduct. To make this adjustment, I first replicated the government's calculation of loss attributable to all shares,[24] and adjusted it to remove loss to shares owned by co-conspirators.

24.     To replicate the government's loss calculation, I followed the same steps. In its analysis, the government assumes that the reported revenue for the first three quarters of 2018 included $12.5 million in fictitious revenue. Accordingly, I first subtracted $12,540,085 of fraudulent revenue from FTE's reported revenue of $263,735,000 for the first three quarters of 2018 and then annualized this figure, to arrive at an estimate of total revenue for FY 2018 of $334,926,553. Had FTE reported this annual revenue figure for 2018, it would have caused FTE to miss its revenue guidance by $15,073,447 ($350,000,000 - $334,926,553 = $15,073,447).

25.     My replication of the government's event study for the February 26, 2019 new contracts announcement date also yielded an abnormal share price increase of $1.24, which results in an abnormal increase in market capitalization of $15,131,839 (calculated as 12,173,173 shares outstanding multiplied by $1.24 per share).

26.     To finish the replication of the government's loss calculation, I then divided the abnormal market capitalization increase of $15.1 million by the $116 million in anticipated new

---

[24] My replication of the government's calculation resulted in a market capitalization loss of $1,966,284, as explained below, consistent with the government's figure of $1,965,615. This replication uses 12,173,173 shares outstanding. This is the number of shares outstanding as of November 12, 2018, reported in FTE's third quarter 2018 Form 10-Q, the latest reported financial statements before the February 26, 2019 new contracts announcement (FTE Q3 2018 Form 10-Q, filed November 19, 2018, p. 1).

contract revenue which resulted in an estimate that for every dollar of expected new revenue, the market capitalization increased by $0.13. Assuming the share price would have moved the same way in reaction to news of a miss of revenue guidance, which would have been reported at approximately the same time, the $15,131,839 miss times the $0.13 change in market capitalization per dollar of revenue miss equals a market capitalization loss of $1,966,284 for all shares.

27.     This aggregate loss for all shares implies a loss per share of $0.16 (calculated as $1,966,284 divided by 12,173,173 shares outstanding). Taking this loss per share and multiplying by the number of shares *not* owned by co-conspirators (12,173,173 – 2,957,333 = 9,215,840) reduces the market capitalization loss to $1,488,598 (9,215,840 shares times $0.16 loss per share).

   **b)  Scenario 2: Adjusting the Government's Loss Calculation Only to Use the January 3, 2019 New Contract Announcement Reduces the Loss Attributable to Mr. Sirotka's Conduct to $1,284,358 and to $972,338 if Shares Held by Co-Conspirators are Also Removed**

28.     Alternatively, keeping everything as it is in the government's loss calculation, but adjusting it to instead use the January 3, 2019 new contracts announcement date results in a market capitalization loss of $1,284,358. In addition, removing the shares held by co-conspirators from the government's calculation results in a market capitalization loss of $972,338 attributable to Mr. Sirotka's conduct.

29.     I used the same steps in the government's loss methodology as described above, but instead of using the market reaction to the February 26, 2019 new contracts announcement (which resulted in a $1.24 abnormal share price increase), I used the market reaction to the January 3, 2019 new contracts announcement (which, as described below, resulted in a $0.51 abnormal share price increase).

30.     Assuming, as the government does, that the reaction to an announcement of revenues from new contracts is an appropriate basis to determine the price impact from a

hypothetical revenue miss, I conducted an event study of FTE's announcement on January 3, 2019 that it secured $129.6 million in new contracts, which was $72.4 million higher than FTE's prior guidance.[25] As discussed above in section V(a), this is a more appropriate event for the purposes of this analysis. The abnormal share price increase from this announcement was $0.51 per share, which resulted in an abnormal increase in market capitalization of $6.2 million (calculated as 12,173,173 shares outstanding multiplied by $0.51 per share).

31.    I then divided the abnormal market capitalization increase of $6.2 million by the $72.4 million in additional anticipated new contract revenue which resulted in an estimate that for every dollar of additional expected new revenue, the market capitalization increased by $0.09. Assuming the share price would have moved the same way in reaction to a miss of revenue guidance, which would have been reported at approximately the same time, the $15,073,447 miss times the $0.09 change in market capitalization per dollar of revenue miss (based on the January 3, 2019 new contracts announcement) equals a market capitalization loss of $1,284,358 for all shares. Therefore, using the exact same methodology as the government uses but a different event study date results in the loss decreasing from $1,965,615 to $1,284,358.

32.    Furthermore, removing the shares owned by co-conspirators reduces the loss to $972,338.[26]

---

[25] FTE's 3Q 2018 press release announced that "by the end of 2018, we expect to have won over $500 million dollars [sic] in new contract work" ("FTE Networks Reports Third Quarter 2018 Results," *GlobeNewswire*, November 20, 2018).

[26] Calculated as 9,215,840 shares not owned by co-conspirators (12,173,173 shares outstanding less 2,957,333 shares owned by co-conspirators) multiplied by loss per share of $0.11 (aggregate loss of $1,284,358 divided by 12,173,173 shares outstanding).

c) **Scenario 3: Adjusting the Government's Loss Calculation to Use the January 3, 2019 New Contracts Announcement, Using $10,077,000 as the Amount of Fictitious Revenue Removed and Removing Shares Held by Co-conspirators Reduces the Loss Attributable to Mr. Sirotka's Conduct to $650,034**

33.     In this alternative calculation, I correct several of the issues in the government's analysis. For the reasons described above in section V(b), calculating a hypothetical revenue guidance miss for full year 2018 based on only the first three quarters of 2018 is flawed. Still using the same overall methodology as the government, I instead limit the fictitious revenue removed to $10,077,000 based on the allegations of the indictment, use the January 3, 2019 new contracts announcement, and remove shares held by co-conspirators from the calculation, which results in a market capitalization loss of $650,034 attributable to Mr. Sirotka's conduct.

34.     I arrive at this figure by first limiting the fictitious revenue to $10,077,000, the amount the indictment alleges was improperly recognized by FTE in 2018. As explained above in section V(b), I am not aware of any evidence that the impact of *correcting for* the fraudulent revenue would be any greater than the amount of fraudulent revenue itself. Therefore, $10,077,000 reflects the difference between what full year 2018 revenue would have been with the fraudulent revenue versus what it would have been without it, without the need to estimate first what each of these numbers would have been.

35.     As in the previous scenario, the abnormal share price increase following the January 3, 2019 new contracts announcement was $0.51 per share, which resulted in an abnormal increase in market capitalization of $6.2 million (calculated as 12,173,173 shares outstanding multiplied by $0.51 per share). I then divided the abnormal market capitalization increase of $6.2 million by the $72.4 million in additional anticipated new contract revenue which resulted in an estimate that for every dollar of additional expected new revenue, the market capitalization increased by $0.09. Assuming the share price would have moved the same way in reaction to a

14

revenue shortfall, the $10,077,000 shortfall times the $0.09 change in market capitalization per dollar of revenue shortfall equals a market capitalization loss of $858,627 for all shares.

36.    Removing the shares owned by co-conspirators reduces the market capitalization loss to $650,034.[27]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 31, 2025 in New York, NY

Vinita Juneja, Ph.D.

---

[27] Calculated as 9,215,840 shares not owned by co-conspirators (12,173,173 shares outstanding less 2,957,333 shares owned by conspirators) multiplied by loss per share of $0.07 (aggregate loss of $858,627 divided by 12,173,173 shares outstanding).

**Exhibit 1**

# N NERA

NERA Economic Consulting
1166 Avenue of the Americas
New York, NY 10036
Tel: 212-345-3148
Mobile: 646-267-5433
vinita.juneja@nera.com
www.nera.com

# Vinita Juneja, Ph.D.
## Senior Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1988
Social Sciences and Humanities Research Council of Canada
     Doctoral Fellow, 1982-1985
A.M., Economics, 1983

**University of Western Ontario** (now known as **Western University**)
B.A., Honors, Economics, 1980
     U.W.O. Continuing Scholar, 1976-1980
     Dean's Honors List, 1976-1979

## Professional Experience

**NERA Economic Consulting**

2017 – 2024   Chair, White Collar, Investigations, & Enforcement Practice
2013 – 2017   Co-Chair, White Collar, Investigations, & Enforcement Practice
2006 – 2011   Board of Directors
2006 – 2009   Chair, Securities and Finance Practice
2000 –   Senior Managing Director (f/k/a/ Managing Director and Senior Vice President)
     Directs projects in the areas of valuation, finance, and securities economics.
1995 – 2000   Vice President
1988 – 1995   Senior Consultant
1988   Senior Economic Analyst
1985 – 1987   Economic Analyst

**Harvard University**

1983 – 1985   Assistant Head Tutor, Department of Economics
     Helped coordinate and administer the undergraduate program in economics at Harvard College; advised undergraduates on their course of study.
1982 – 1985   Teaching Fellow, Department of Economics
     Courses on microeconomics, economics of business regulation, and economics of bureaucracy.
1981 – 1985   Resident Tutor, Cabot House (1982-1985), Nonresident Tutor, Pforzheimer House (1981-1982), Harvard College
     Served as economics tutor, resident assistant and academic advisor.

**Exhibit 1**                                          Vinita Juneja, Ph.D.

**Shell Canada**

1981 – 1982   Economic Consultant, Strategic Planning Department
Responsible for a study of multinationals and foreign investment, with focus on the oil and natural gas sectors.

Summer 1981  Junior Economist, Strategic Planning Department
Responsible for economic forecasting of the world oil market, policy analysis, and macroeconomic research.

**University of Western Ontario** (now known as **Western University**)

1979 – 1980   Teaching Assistant, Department of Economics
Microeconomics and labor economics.

**Toronto Investment Management**

Summer 1979  Economic Consultant
Conducted research for various projects, including reports on forecasting and the size of the market sector in Canada.

**University of Toronto**

Summer 1979 Teaching Assistant, Department of Economics
Introductory economics.
.

# Professional Activities

Member, FINRA Board of Arbitrators, 2007 – 2009

Member, NASD Board of Arbitrators, 1990 – 2007

# Testimony (Last Four Years)

Deposition before the 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana in the matter of *James J. Donelon, Commissioner of Insurance for the State of Louisiana v. Americas Insurance Company* consolidated with *Cadence Bank v. Billy Bostick, in His Capacity as Receiver for Assurance Holding Corporation, Assure Underwriting Agency, and American Insurance Company*, 2025.

Deposition before the United States District Court, Southern District of New York, in the matter of *Stadium Capital, LLC, v. Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown*, 2025.

Deposition before the Circuit Court of the Fourteenth Judicial Circuit in and for Bay County, Florida, in the matter of *Zachary Young and Nemex Enterprises, Inc. v. Cable News Network, Inc.*, 2025.

**Exhibit 1**

Vinita Juneja, Ph.D.

Deposition before the United States District Court, Northern District of Illinois, Eastern Division in the matter of *United States Securities and Exchange Commission, v. John M. Fife, Chicago Venture Partners, L.P., Iliad Research and Trading L.P., St. George Investments LLC, Tonaquint, Inc., and Typenex Co-Investment, LLC.*, 2024.

Testimony and Deposition before the American Arbitration Association, in the matter of *Texas Brine Company, LLC, v. Occidental Chemical Corporation*, 2023.

Deposition before the United States District Court for the Southern District of Texas, Houston Division, in the matter of *Occidental Petroleum Corporation and Anadarko Petroleum Corp v. Wells Fargo Bank, N.A.,* 2022.

Deposition before the United States District Court for the Southern District of New York, in the matter of *Rohan Ramchandani v. Citigroup, Inc, Citicorp and Citibank, N.A*., 2022.

Deposition before the United States District Court for the Northern District of California, in the matter of *Jonathan Davis and Roei Azar, Individually and on Behalf of All Others Similarly Situated v. Yelp, Inc., Jeremy Stoppelman, Lanny Baker, and Jed Nachman,* 2021.

August 2025

# Exhibit 2
# Materials Relied Upon

**Legal Documents and Communications**

Superseding Indictment, *United States v. Michael Palleschi, David Lethem, and Anthony Sirotka*, No. S1 21 Cr. 454 (CM) (S.D.N.Y.), Jun. 6, 2022.

*United States v. Anthony Sirotka*, 1:21-cr-00454 (S.D.N.Y.), Jun. 5, 2023, Minute Entry.

Government's Sentencing Memorandum, *United States v. David Lethem*, No. 21 Cr. 454 (CM) (S.D.N.Y. May 6, 2025) (Dkt. No. 100).

**SEC Filings**

FTE Form 8-K, filed April 18, 2018.

FTE Q3 2018 Form 10-Q, filed November 19, 2018.

FTE Form 8-K, filed November 20, 2018.

FTE Form 8-K, filed December 19, 2018.

FTE Form 8-K, filed January 24, 2019.

FTE FY 2018 Form 10-K, filed May 11, 2020.

FTE Form DEF 14A, filed December 10, 2018.

**Earnings Call Transcripts**

FTE Q3 2018 Earnings Call, November 20, 2018, obtained from FactSet Research Systems, Inc.

**Press Releases**

"FTE Networks Announces $45 Million in Contract Awards for January," *GlobeNewswire*, February 8, 2018.

"FTE Networks Awarded New Contract Valued at $36 Million," *GlobeNewswire*, February 15, 2018.

"FTE wins $27.5m in contracts by two multi-national Fortune 500 Companies," *MarketLine*, February 21, 2018.

"FTE Networks Awarded Several New Contracts Totaling Approximately $24.3 Million," *GlobeNewswire*, April 11, 2018.

"FTE Networks Awarded New Contracts Totaling Approximately $28 Million," *GlobeNewswire*, May 1, 2018.

"FTE Networks Awarded New Contracts Totaling Approximately $36.8 Million," *GlobeNewswire*, June 12, 2018.

"FTE Networks Awarded New Contracts Totaling Approximately $42.7 Million," *GlobeNewswire*, July 10, 2018.

"FTE Networks Awarded New Contracts Totaling Approximately $61.4 Million," *GlobeNewswire*, August 1, 2018.

"FTE Networks Awarded New Infrastructure Contracts Totaling Approximately $141.4 Million in August and September," *GlobeNewswire*, October 2, 2018.

"FTE Networks Reports Third Quarter 2018 Results," *GlobeNewswire,* November 20, 2018.

"FTE Networks Completes 2018 with Approximately $572.4 Million in New Infrastructure Contract Awards," *GlobeNewswire*, January 3, 2019.

"FTE Networks Awarded Approximately $116 Million in New Infrastructure Contracts in January and February," *GlobeNewswire*, February 26, 2019.

**Data**

FTE share price and volume data from Bloomberg L.P.

Index data from Bloomberg L.P.

Analyst reports covering FTE from 2018 to 2020, obtained from Refinitiv Eikon.

To the extent not included above, all sources, references, and citations in the declaration and exhibits.

**Exhibit 3**
**FTE Networks, Inc.**
**Stock Price and New Contracts Announcements**
**January 2, 2018 to December 11, 2019**



**Notes and Sources:**

Data are from Bloomberg L.P. and FTE press releases. Gaps indicate days on which FTE did not trade.

FTE halted trading for the following periods of 2019: 3/14/19 - 3/25/19, 5/15/19 - 6/14/19, 10/9/19 - 10/10/19.

**Exhibit 4**
**Replication of Government's Loss Calculation and NERA Alternatives**

| Item (1) | Formula (2) | 2/26/2019 New Contract Announcement — Gov't Amount[1] (3) | 2/26/2019 New Contract Announcement — NERA Replication[2] (4) | 1/3/2019 New Contract Announcement[3] — Using $12.5 Million in Fraudulent Revenue in Q1-Q3 2018 (5) | 1/3/2019 New Contract Announcement[3] — Assuming a $10.1 Million Revenue Shortfall to FY 2018 Revenue (6) |
|---|---|---|---|---|---|
| ***Revenue Miss for Loss Calculation*** | | | | | |
| A.  FTE Reported Q1-Q3 2018 Revenue | | $263,700,000 | $263,735,000 | $263,735,000 | |
| B.  Fraudulent Revenue Attributable to Mr. Sirotka | | $12,540,085 | $12,540,085 | $12,540,085 | $10,077,000 |
| C.  Adjusted Q1-Q3 2018 Revenue | [A] - [B] | $251,159,915 | $251,194,915 | $251,194,915 | |
| D.  Annualized Adjusted Q1-Q3 2018 Revenue | [C] * 4/3 | $334,879,887 | $334,926,553 | $334,926,553 | |
| E.  FTE 2018 Revenue Guidance | | $350,000,000 | $350,000,000 | $350,000,000 | |
| F.  Estimated 2018 Revenue Guidance Miss | [E] - [D] | $15,120,113 | $15,073,447 | $15,073,447 | |
| **G.  Revenue Miss for Calculation of Loss** | **[F] or [B]** | **$15,120,113** | **$15,073,447** | **$15,073,447** | **$10,077,000** |
| ***Event Study and Loss Calculation*** | | | | | |
| H.  Value of Unexpected New Contracts Announced by FTE | | $116,000,000 | $116,000,000 | $72,400,000 [4] | $72,400,000 [4] |
| I.  Abnormal FTE Share Price Increase Following New Contract Announcement | | $1.24 | $1.24 [5] | $0.51 [5] | $0.51 |
| J.  Number of FTE Shares Outstanding at New Contract Announcement | | *12,177,419* | 12,173,173 [6] | 12,173,173 | 12,173,173 |
| K.  Abnormal Increase in FTE Market Cap Following New Contract Announcement | [I] * [J] | $15,100,000 | $15,131,839 | $6,168,961 | $6,168,961 |
| L.  Estimated Increase in FTE Market Cap for Each Dollar of New Revenue Announced | [K] / [H] | $0.13 | $0.13 | $0.09 | $0.09 |
| **M. Loss Attributable to Mr. Sirotka (Using All Shares)** | **[G] * [L]** | **$1,965,615** | **$1,966,284** | **$1,284,358** | **$858,627** |
| N.  Shares Held by Co-conspirators[7] | | 0 | 2,957,333 | 2,957,333 | 2,957,333 |
| **O.  Loss Attributable to Mr. Sirotka (Removing Shares Held by Co-conspirators)** | **([M] / [J]) * ([J] - [N])** | **$1,965,615** | **$1,488,598** | **$972,338** | **$650,034** |

**Exhibit 4**
**Replication of Government's Loss Calculation and NERA Alternatives**

| Item | Formula | 2/26/2019 New Contract Announcement | | 1/3/2019 New Contract Announcement[3] | |
|---|---|---|---|---|---|
| | | Gov't Amount[1] | NERA Replication[2] | Using $12.5 Million in Fraudulent Revenue in Q1-Q3 2018 | Assuming a $10.1 Million Revenue Shortfall to FY 2018 Revenue |
| (1) | (2) | (3) | (4) | (5) | (6) |

**Notes and Sources:**

Data are from the Lethem Sentencing Memorandum, the Indictment, FTE's SEC filings, and FTE press releases. Italicized values represent implied calculations. Boxes represent inputs that have changed from the previous column.

[1] Figures as presented in the government's calculation in the Lethem Sentencing Memorandum and based on my understanding from counsel and the Indictment. Actual calculations will differ due to rounding in the government's presented figures.

[2] Calculation represents NERA's replication of the government's loss calculation, using FTE's unrounded reported Q1-Q3 2018 revenue (FTE Q3 2018 Form 10-Q, filed November 19, 2018, p. 5), NERA's calculated abnormal share price increase following the February 26, 2019 new contracts announcement, and FTE's shares outstanding figure as of November 12, 2018 as reported in FTE's 3Q 2018 Form 10-Q (FTE Q3 2018 Form 10-Q, filed November 19, 2018, p. 1).

[3] These alternative scenarios use NERA's calculation of the abnormal share price increase following the January 3, 2019 new contracts announcement instead of the February 26, 2019 new contracts announcement.

[4] On January 3, 2019, FTE announced that they had secured $129.6 million in new contract awards during the fourth quarter of 2018, bringing the total for 2018 to $572.4 million ("FTE Networks Completes 2018 with Approximately $572.4 Million in New Infrastructure Contract Awards," *GlobeNewswire* , January 3, 2019). However, in FTE's third quarter 2018 press release, FTE announced that "we expect to have won over $500 million dollars [sic] in new contract work" by the end of 2018 ("FTE Networks Reports Third Quarter 2018 Results," *GlobeNewswire* , November 20, 2018). Therefore, approximately $72.4 million of new contract awards announced in January is in excess of FTE's prior guidance.

[5] Abnormal share price reactions following the January 3, 2019 and February 26, 2019 new contracts announcements are based on a market model regressing the daily natural log returns of FTE over the estimation period January 2, 2018 to December 31, 2018 on the daily natural log returns of the NYSE Composite Index and the NYSE U.S. Market Utilities and Telecommunications Sector Index.

[6] FTE reported 12,173,173 outstanding shares of common stock as of November 12, 2018 in its third quarter 2018 Form 10-Q, the latest reported financial statements before the February 26, 2019 new contracts announcement (FTE Q3 2018 Form 10-Q, filed November 19, 2018, p. 1).

[7] According to FTE's DEF 14A, filed December 10, 2018, co-conspirators Mr. Palleschi, Mr. Lethem, Director-1, and TLP Investments LLC collectively held 2,593,694 shares of FTE common stock as of November 12, 2018 (FTE Form DEF 14A, filed December 10, 2018, p. 26). Additionally, according to FTE's 2018 Form 10-K, filed May 11, 2020, Mr. Sirotka was issued 363,639 shares on October 11, 2018 (FTE FY 2018 Form 10-K, filed May 11, 2020, p. 45). Together, this represents 2,957,333 shares held by co-conspirators.